UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

William DeWeese,

    Plaintiff,      :      Case No. 2:18-cv-319

    v.      Judge Sarah D. Morrison
     :      Magistrate Judge Kimberly A. Jolson

Hocking Technical College,

    Defendant.

## OPINION AND ORDER

This matter is before the Court on Defendant's Motion for Summary Judgment. (ECF No. 15.) Plaintiff filed a Memorandum in Opposition to the Motion (ECF No. 24), and Defendant filed a Reply (ECF No. 27). The matter is now ripe for decision.

**I. BACKGROUND**

In 1996, Plaintiff William DeWeese was hired by Defendant Hocking Technical College ("Hocking") to be the program manager for the National Ranger Training Institute ("NRTI"), part of Hocking's School of Natural Resources. (William DeWeese Dep. 16:9–14, ECF No. 14; *id.* at Ex. 2, ECF No. 14-1, at 22; Kenneth Bowald Dep. 10:16–11:5, ECF No. 21.) In this position, Mr. DeWeese used a number of titles—program coordinator, academy commander, academy coordinator, and assistant professor. (DeWeese Dep. 156:22–157:1.)

Regardless of title, Mr. DeWeese was responsible for ensuring that the NRTI's programs maintained their certifications and accreditations. (*Id.* at 168:2–15, 231:15–24.) He also was responsible for managing the NRTI's budget, although he did not have the authority to determine how much that budget would be. (*Id.* at 167:16–168:1.) He also taught some NRTI classes, including firearms training. (*Id.* at 37:6–38:7, 140:7–13.)

Mr. DeWeese was the only full-time employee of the NRTI, and the program's only other employee was Connie Cassady, the NRTI's part-time administrative assistant. (*Id.* at 170:20–171:4.) Hocking's president considered Mr. DeWeese to be an essential aspect of the NRTI, so much so that he once remarked that if Mr. DeWeese were to get hit by a car, the NRTI would not be able to continue. (*Id.* at 183:10–20.)

Mr. DeWeese's initial employment contract stated that his employment could be terminated by either party at will and that Hocking reserved the right to modify his terms of employment. (*Id.* at Ex. 2.) On June 5, 2009, Hocking's Board of Trustees notified Mr. DeWeese that Hocking had eliminated multi-year or extended contracts for employees. (*Id.* at Ex. 8, ECF No. 14-1, at 28.) This memorandum also notified Mr. DeWeese that his current contract would end on June 30, 2009, and that his employment would continue at will. (*Id.*)

One of the programs that was a part of the NRTI, and that Mr. DeWeese oversaw, was the Ranger Academy Program (the "Program"), which had two components, the Seasonal Law Enforcement Training Program ("SLETP") and the Ohio Peace Officer Basic Program. (*Id.* at 187:3–9.) The Program was designed to train its students to become both seasonal park rangers and Ohio peace officers. (*Id.* at 96:5–97:11.)

The SLETP trained seasonal park rangers for the National Park Service ("NPS"). (*Id.* at 22:16–23:10.) This aspect of the Program is what made it unique, since Hocking already offered a standalone peace officer training program. (Bowald Dep. 27:17–28:2.) The NPS was responsible for certifying the SLETP. (DeWeese Dep. 23:20–24:1.).

On January 3, 2013, Tammy Keller, Seasonal Academy Program Manager at the NPS, sent a letter to Mr. DeWeese notifying him that the SLETP was being put on probation due to a failure to meet NPS standards. (Bowald Dep. Ex. B, ECF No. 21-1, at 2–4; DeWeese Dep. Ex.

15, ECF No. 14-1, at 42.) This was concerning because it was expected that the loss of certification would result in the termination of the SLETP. (DeWeese Dep. 84:10–11.)

As a part of this probationary period, in May 2013, Ranger Keller audited the SLETP's compliance with NPS requirements. (*Id.* at 91:20–92:3.) On August 20, 2013, Ranger Keller sent a letter to Mr. DeWeese reporting her findings from the audit and outlining various steps that Hocking needed to take in order to maintain the SLETP's NPS certification. (Bowald Dep. Ex. D, ECF No. 21-1, at 13–14; DeWeese Dep. 117:15–118:6.)

On November 15, 2013, Mr. DeWeese sent a letter (the "November 2013 letter") to Kenneth Bowald, who was the dean of Hocking's School of Natural Resources and Mr. DeWeese's supervisor. (DeWeese Dep. 88:12–13; *id.* at Ex. 1, at 17–19, ECF No. 14-1, at 17–19; Bowald Dep. 8:23–9:13.) He also sent a copy of this letter to Kim Mullen, the School of Natural Resources Assistant Dean; Connie Cassady; and Ranger Keller. (DeWeese Dep. 126:5–15, Ex. 1, at 19.) Mr. DeWeese sent this letter to the dean in his official capacity as academy commander. (*Id.* at 231:1–232:4.)

In this letter, Mr. DeWeese expressed frustration and complaints regarding the Program. (*Id.* at Ex. 1 at 17.) In particular, Mr. DeWeese expressed his concern that the Program would lose its accreditation. (*Id.*) In order to avoid such a result, Mr. DeWeese suggested cancelling the upcoming semester of the Program, which was scheduled to start in January 2014. (*Id.* at 18; DeWeese Dep. 129:15–20.) Mr. DeWeese then outlined a number of "to-do list" items that he sought to use this extra time to complete, explaining that he would not be able to complete any of these items without canceling the Program for a semester. (*Id.* at Ex. 1 at 18) He also predicted that if he were not able to complete this list, he would retire sooner than he otherwise would, the Program would lose its certification, and "everything that's been done will be lost." (*Id.*)

3

Hocking administrators were concerned about the lost revenue resulting from suspending the Program for a semester, and ultimately, Hocking did not agree to suspend the Program. (Bowald Dep. 36:1–37:6, 54:11–17.) As a result, Mr. DeWeese began to prepare for the upcoming semester. (DeWeese Dep. 181:15–182:6.)

The NPS required that Mr. DeWeese send a "Request for Start of Academy" to Ranger Keller thirty days in advance of the start of each new semester of the SLETP. (*Id.* at 135:18–136:1, Ex. 15.) When the NPS did not receive such a notice in December 2013, the NPS assumed that Hocking would not be running the SLETP in January 2014. (*Id.* at Ex. 15.) However, on Friday, January 3, 2014, Mr. DeWeese sent a tardy notice to the SLETP, notifying them that the SLETP would be starting on the following Monday. (*Id.* at 136:2–6, Ex. 15.) Due to the late notice, the NPS was unable to certify the course. (*Id.* at Ex. 15.) Nevertheless, Mr. DeWeese proceeded with the course without NPS certification using the same curriculum as in the prior year. (*Id.* at 188:1–12, Ex. 15.) On March 3, 2014, the NPS officially suspended Hocking's SLETP due to noncompliance with NPS policy. (*Id.* at Ex. 15)

On March 20, 2014, Mr. DeWeese was driving through campus after having finished teaching for the day when he was flagged down by a Hocking police officer. (*Id.* at 24:11–17, 28:9–21.) The officer escorted Mr. DeWeese to Mr. DeWeese's office and asked him to surrender any keys that he had to the campus, handed him a letter, and told him to leave the campus. (*Id.* at 28:22–29:3, 30:4–9.) The letter was from Nicolette Dioguardi, Hocking General Counsel and Vice President of Risk, and Adolphus Matthews, Chief of the Hocking Police Department. (*Id.* at Ex. 1, at 16, ECF No. 14-1, at 16.) This letter notified Mr. Hocking that he was being placed on paid administrative leave while Hocking conducted an investigation into the Program. (*Id.*) The letter also banned Mr. DeWeese from Hocking-owned property. (*Id.*)

On July 3, 2014, Ms. Dioguardi notified Mr. DeWeese that as of July 31, 2014, the NRTI was being discontinued, his position as the NRTI program commander was being eliminated, and he was not being replaced. (*Id.* at Ex. 16, ECF No. 14-1, at 44.) Mr. DeWeese remained on paid administrative leave until July 24, 2015, when his position was terminated. (*Id.* at 206:5–7.)

On January 29, 2018, Mr. DeWeese filed an amended complaint against Hocking in state court consisting of two federal claims and three state claims.[1] (ECF Nos. 1-1, 1-2.). Hocking timely removed this case to federal court on the grounds of federal question jurisdiction. (Not. of Removal, ECF No. 1 ¶¶ 6–7.)

## II. STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir.1993). The burden then shifts to the nonmoving party to "'set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970).

---

[1] Mr. DeWeese filed his original complaint on March 8, 2016, after which Hocking removed the case to this Court. (Not. of Removal, ECF No. 1 ¶ 2.) Hocking filed a motion to dismiss, which this Court granted in part, dismissing the federal claims without prejudice and remanding the remaining state claims. (*Id.*) On remand, Plaintiff moved the state court for leave to file an amended complaint. (*Id.* ¶ 3.) Hocking again removed the action but did so before the state court had ruled on the pending motion. (*Id.*) As a result, this Court dismissed the case for lack of subject matter jurisdiction because the not-yet-amended complaint lacked any federal causes of action. (*Id.*)

5

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "summary judgment will not lie . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

## III. ANALYSIS

Mr. DeWeese asserts two federal claims, alleging that Hocking has violated his procedural due process rights (Count One) and his substantive due process rights (Count Two). He also asserts three state claims—Intentional Infliction of Emotional Distress (Count Three), Termination in Violation of Public Policy (Count Four), and Violation of Public Records Law (Count Five). Defendants have sought summary judgment as to all five claims.

### A. Procedural Due Process Claim

In evaluating a procedural due process claim, it must first be discerned whether the plaintiff had a property right that was implicated. *Christophel v. Kukulinsky*, 61 F.3d 479, 485 (6th Cir. 1995). As a result, the threshold question is whether Mr. DeWeese had a property right in his position as program manager for the NRTI.

Ohio's civil service system designates public employees as either "classified" or "unclassified" employees. *Id.* at 482. Once a classified employee is employed or appointed, he may not be removed without due process. *Id.*; *accord Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538–39 (1985). Unclassified employees, in contrast, have no property right in their continued employment. *Christophel*, 61 F.3d at 482.

Whether an employee is classified or unclassified is a question of fact. *See In re Termination of Employment of Pratt*, 321 N.E.2d 603, 608 (Ohio 1974). However, it is not enough for Mr. DeWeese to simply question this fact. Unless he "properly support[s this] assertion" the Court may consider the fact to be undisputed. Fed. R. Civ. P. 56(e)(2); *see CareToLive v. Food & Drug Admin.*, 631 F.3d 336, 340 (6th Cir. 2011) ("A mere scintilla of evidence is insufficient to create a material question of fact and defeat a motion for summary judgment . . . ."). As a result, in order to stave off summary judgment, Mr. DeWeese must have presented sufficient evidence to create a factual dispute regarding whether he was a classified employee.

Generally speaking, it is an employee's duties, not his job title, that determine whether he is a classified employee. *See In re Termination*, 321 N.E.2d at 608–09. While the civil service statutory scheme outlines particular positions that are in the unclassified service, it is the employee's duties, rather than his official job title, that determine whether he works in one of the listed positions. *See Czechowski v. Univ. of Toledo*, No. 98AP-366, 1999 WL 152584, at *3–*5 (Ohio Ct. App. Mar. 18, 1999) (determining that plaintiff was not a "business manager" within the meaning of § 124.11 even though "business manager" was her official title).

Under Ohio law, all public college "administrative officers, . . . instructors, teachers, and such employees as are engaged in educational or research duties . . . as determined by the governing body of the" school are part of the unclassified civil service. Ohio Rev. Code Ann. § 124.11(A)(7)(a) (West 2019). Thus, if Mr. DeWeese's job responsibilities correspond with that of an "administrative officer[]," "instructor[]," or "teacher[]," or if he was "engaged in educational or research duties . . . as determined by the governing body of" Hocking, then Mr. DeWeese is an unclassified employee.

7

Hocking argues that Mr. DeWeese was an unclassified employee because he was designated as an "at will" employee and because his job description showed that he handled all of the Program's day-to-day operations and was its only full-time instructor. (Def. Mot. Summ. J., ECF No. 15, at 8.) In response, Mr. DeWeese argues that the status of his position was never made clear to him. (Pl. Resp. to Def. Mot. Summ. J., ECF No. 24, at 1–2.) He also relies on two cases that he claims support his argument that he was a classified employee. (*Id.* at 8–9.)

With regard to Mr. DeWeese's contention that the status of his position was unclear to him, he has only put forth the absence of evidence. But the absence of evidence is not evidence. *See Celotex*, 477 U.S. at 325 ("[T]he burden on the moving party may be discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case."). This is not enough to stave off summary judgment.

As to the first case he relies on, *Gunasekera v. Irwin*, that case stands for the proposition that a professor may have a property interest in his or her faculty status. 551 F.3d 461, 468–69 (6th Cir. 2009). However, as Hocking points out, such a property interest was not pleaded in Mr. DeWeese's complaint. (Def. Reply, ECF No. 27, at 10–11.) Rather, Mr. DeWeese only alleged a property interest based on his asserted classification as a classified employee. (ECF No. 1-2 ¶¶ 57, 74–75.) As a result, Mr. DeWeese is not entitled to pursue this theory of liability. *Cf. Drake v. City of Detroit*, 266 F. App'x 444, 450 (6th Cir. 2008) (finding that even "liberal notice pleading" requires more than a "cursory reference" to a particular claim in order to provide "fair notice" to the defendant).

The second case, *Robinson v. Ohio State University*, relied on a now-repealed provision of the Ohio Administrative Code that, by default, designated "employees engaged in education or research" as classified employees. *See* No. 81AP-517, 1982 WL 4144, at *2 (Ohio Ct. App.

Apr. 29, 1982) (relying on Ohio Adm. Code, Section 124-1-05(B)). That default designation no longer exists, and that case is no longer good law.

Based on the undisputed facts, the Court concludes that Mr. DeWeese was an unclassified employee. His job responsibilities included teaching, and he was primarily responsible for overseeing and administering the Program. In fact, Mr. DeWeese was such a crucial part of the Program that Hocking's president did not believe that the Program could run without him. Regardless of his title, Mr. DeWeese's duties correspond to several provisions within § 124.11(A)(7)(a)—he acted as an administrative officer of the NRTI, and he also was a teacher and an instructor.

Furthermore, Mr. DeWeese was not only hired as an at will employee, but in 2009, he was specifically told that Hocking was discontinuing employment contracts and that he would be continuing on as an at will employee. This is consistent with Hocking's decision to designate Mr. DeWeese as an unclassified employee. While Mr. DeWeese claims that he did not know that he was an unclassified employee, that is immaterial. *Cf. Chubb v. Ohio Bureau of Workers' Comp.*, 690 N.E.2d 1267, 1270 (Ohio 1998) (allowing public employer to raise estoppel defense to prevent employee from claiming classified status if employee had accepted the benefits of an unclassified position, even unknowingly).

The Court finds that there is no genuine issue of material fact regarding Mr. DeWeese's contention that he is a classified employee and that Hocking is entitled to judgment as a matter of law. The Court **GRANTS** Hocking's Motion for Summary Judgment as to Count One.

### B. Substantive Due Process Claim

This Court has previously dismissed Mr. DeWeese's substantive due process claim on the grounds that Mr. DeWeese failed to allege a substantive due process violation. No. 2:16-CV-313,

ECF No. 18, at 16–22. Mr. DeWeese has since amended his complaint and, although he still captions his second claim as a "Substantive Due Process Violation," it is now, in substance, a First Amendment retaliation claim. (*Compare* ECF No. 1-2, 12–15, *with* No. 2:16-CV-313, ECF No. 1-1, at 10–11.) Given that Mr. DeWeese makes only First Amendment retaliation arguments to support his claim, (ECF No. 24, at 10–16), and given this Court's previous ruling, the Court construes the Complaint as having abandoned any claim of a substantive due process violation and instead only claiming a First Amendment violation.

A First Amendment retaliation claim by a public employee requires proof of three elements—1) that the speech was protected, 2) that the employer took an adverse action that would chill an ordinary person in the exercise of his First Amendment rights, and 3) that the protected speech was a substantial or motivating factor in the employer's decision. *Haynes v. City of Circleville*, 474 F.3d 357, 362–63 (6th Cir. 2007). Because Mr. DeWeese cannot establish the existence of the first element, Hocking is entitled to summary judgment.

Proving that the speech at issue was protected requires that the public employee demonstrate that he was speaking 1) "as a citizen" 2) on a matter of public concern. *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 542 (6th Cir. 2007). The "as a citizen" component of the protected speech element requires that the public employee be speaking as a citizen, rather than as an employee. This is because an employee who is speaking as an employee has no First Amendment cause of action even if the employer punishes the employee for his speech. *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). The government has "broader discretion to restrict speech when it acts in its role as employer . . . ." *Id.* "Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen." *Id.* at 421–22. Accordingly, the key question is whether

the employee's "speech indisputably 'owes its existence to [his] professional responsibilities . . . .'" *Weisbarth*, 499 F.3d at 544 (quoting *Garcetti*, 547 U.S. at 421).

The speech that Mr. DeWeese claims was the basis for Hocking's alleged retaliation is the November 2013 letter. (ECF No. 1-2 ¶ 84.) Mr. DeWeese makes the following arguments to support his contention that this letter was written as a citizen rather than as an employee: 1) he had never previously written a letter like this before, 2) NRTI compliance was the ultimate responsibility of the Dean, and 3) Mr. DeWeese had no power to correct the NRTI's problems because he had no ability to increase the NRTI's budget. (ECF No. 24 at 11–12.) At bottom, Mr. DeWeese asserts that this letter was "within the Dean's area of job responsibility" rather than his own. (*Id.* at 12.)

These arguments miss the point as they demonstrate only that the NRTI's compliance issues were an extraordinary situation and that Mr. DeWeese did not have the ability to correct these issues on his own. They do not, however, diminish the fact that Mr. DeWeese was the head of the NRTI and that he wrote this letter in his official capacity in order to try to fix the deficiencies in the NRTI. Mr. DeWeese has acknowledged these facts, and they are fatal to his claim.

Mr. DeWeese's speech undoubtedly "owe[d] its existence to [his] professional responsibilities." *See Garcetti*, 547 U.S. at 421. He was the head of the NRTI program and its only full-time employee. He was responsible for ensuring that the NRTI remained in compliance with the NPS; though compliance may have been a responsibility shared by Dean Bowald and Assistant Dean Mullen, that does not mean that compliance was not part of Mr. DeWeese's "professional responsibilities." While the November 2013 letter was "within the Dean's area of job responsibility," it was within Mr. DeWeese's area of responsibility, too.

Mr. DeWeese cites no authority to support his claim that one can only "speak as an employee" in an area in which he or she has *unsupervised* authority or responsibility. This contradicts both the facts and the reasoning of *Garcetti*. The plaintiff in *Garcetti*, Richard Ceballos, was an assistant district attorney who complained to his superiors about what he believed were misstatements in a search warrant. 547 U.S. at 413–14. Despite Mr. Ceballos's concerns, his supervisors decided to proceed with the prosecution of the case, and Mr. Ceballos alleged that he was subsequently the victim of retaliation. *Id.* at 414–15 In other words, the situation arose *because* Mr. Ceballos complained to his supervisors about a matter in which he lacked the authority to make the decision about whether or not to proceed with the prosecution.

Classifying an employee as a "citizen" when discussing areas in which he does not have final decisionmaking authority would flip *Garcetti* on its head. *Garcetti* reasoned that supervisors must be able to "ensure that their employees' official communications are accurate, demonstrate sound judgment, and promote the employer's mission." *Id.* at 422–23. Under Mr. DeWeese's argument, *only* supervisors would be restricted in their speech, and those supervisors would have no ability to restrict the speech of their employees as it relates to their jobs.

Regardless, the Court need not rely on extrapolating from *Garcetti*, because the Sixth Circuit has already decided a case that is strikingly similar to Mr. DeWeese's. In *Haynes v. City of Circleville*, the plaintiff was the administrator of the police canine handling program and was placed on administrative leave after writing a memorandum in which he complained to the police chief about cost-containment measures that were limiting dog training. 474 F.3d at 359–60. The Sixth Circuit found "that he was speaking in his capacity as a public employee" and summed up the situation as follows: "The context of the memo as a whole is best characterized as that of a disgruntled employee upset that his professional suggestions were not followed as they had been

in the past." *Id.* at 364. Mr. DeWeese seeks to distinguish this case on the grounds that "Mr. DeWeese was not a disgruntled employee." (ECF No. 24, at 14.) Even assuming that to be true, that distinction does not make *Haynes* inapposite. Mr. DeWeese, like Mr. Haynes, wrote a letter to his supervisor complaining about changes to a program for which he was responsible. Mr. DeWeese, like Mr. Haynes, was subsequently placed on administrative leave. And Mr. DeWeese, like Mr. Haynes, was speaking in his capacity as an employee and has no First Amendment protections against his employer's response to that speech.

Because Mr. DeWeese's First Amendment Retaliation (née Substantive Due Process) claim fails at the first hurdle, there is no need for the Court to consider any other aspect of the claim. Hocking's Motion for Summary Judgment is **GRANTED** as to Count Two.

### C. Intentional Infliction of Emotional Distress

A claim of intentional infliction of emotional distress ("IIED") requires proof that "(1) the defendant intended to cause, or knew or should have known that his actions would result in serious emotional distress; (2) the defendant's conduct was so extreme and outrageous that it went beyond all possible bounds of decency and can be considered completely intolerable in a civilized community; (3) the defendant's actions proximately caused psychological injury to the plaintiff; and (4) the plaintiff suffered serious mental anguish of a nature no reasonable person could be expected to endure." *McKee v. McCann*, 102 N.E.3d 38, 45 (Ohio Ct. App. 2017).

Mr. DeWeese argues that "the manner in which [he] was banished from campus, in full view of students, staff and faculty" constitutes IIED. (ECF No. 24, at 17.) He cites no cases in support, relying only on a publication from the American Association of University Professors ("AAUP") report on faculty suspension. (*Id.*) Mr. DeWeese misquotes this AAUP publication and takes it out of context. *Compare* ECF No. 24, at 17, *with* Am. Ass'n. of Univ. Professors,

The Use and Abuse of Faculty Suspensions 8 (Aug. 2008), *available at*, https://provost.illinois state.edu/downloads/aspt/urc_minutes/MinutesURC2013-2014AllMeetings.pdf. Regardless, Mr. DeWeese provides no explanation for why conduct the AAUP might consider to be "insulting" or "grossly disproportionate" has any relevance to the legal determination of what constitutes "extreme and outrageous" conduct. Importantly, an IIED claim does not cover "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 453 N.E.2d 666, 671 (Ohio 1983) (quoting Restatement (Second) of Torts § 46 cmt. d) (1965), *abrogated on other grounds by Welling v. Weinfeld*, 866 N.E.2d 1051 (Ohio 2007). "[P]laintiffs must necessarily be expected and required to be hardened . . . to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where some one's [sic] feelings are hurt." *Id.*

The Court finds it more instructive to look at how other courts have ruled when examining an IIED claim premised on police activity. First, Ohio courts grant great latitude to law enforcement acting within the bounds of their authority. *See, e.g.*, *McKee*, 102 N.E.3d at 45 ("As a police officer investigating a possible crime, [the officer] had wide latitude to take control of the scene."); *Miller v. City of Xenia*, No. 2001 CA 82, 2002 WL 441386, at *2 (Ohio Ct. App. Mar. 22, 2002) ("Although [plaintiff] may have been embarrassed because his neighbors were watching, the officers had no control over the curiosity of his neighbors."). Mr. DeWeese may quibble with the Hocking police officer's choice of tactics, but he has not provided any evidence that the officer exceeded the bounds of his authority by escorting a suspended employee.

Second, similar courts have ruled in the face of similar facts that a reasonable police escort, or even an arrest, is not so "extreme and outrageous" as to sustain an IIED claim. *See,*

*e.g.*, *Norman v. City of Lorain*, No. 1:04 CV 913, 2006 WL 3337466, at *1–*2 (N.D. Ohio Nov. 16, 2006) (granting summary judgment on IIED claim where police officer handcuffed plaintiff and broke her arm while escorting her to hospital); *Hale v. Vance*, 267 F. Supp. 2d 725, 736–37 (S.D. Ohio 2003) ("[W]here the detention and arrest are lawful, they cannot give rise to a subsequent civil action against the detaining or arresting officer for inflicting emotional distress."); *McCoy v. Robinson*, No. 97-2023, 1998 WL 10373, at *3 (4th Cir. Jan. 14, 1998) (per curiam) (finding that arrest and questioning in accord with standard police procedures were not extreme and outrageous); *Glen v. Northcoast Behavioral Healthcare Sys.*, No. 2002-05174, 2005 WL 1532855, at *5 (Ohio Ct. Claims June 22, 2005) (granting judgment for defendant on IIED claim where defendant had "legitimate business reasons" for having plaintiff arrested after her employer had her administratively and criminally investigated); *Wornick Co. v. Casas*, 856 S.W.2d 732, 735 (Tex. 1993) (holding that security escort of terminated employee did not constitute IIED and citing cases from other states' courts for the same).

It is beyond this Court's purview to condone or condemn the course of action that Hocking chose to take. But regardless of propriety, the Court finds that the conduct that Mr. DeWeese faults is not "extreme and outrageous" as a matter of law.

Hocking's Motion for Summary Judgment is **GRANTED** as to Count Three.

### D. Termination in Violation of Public Policy

Mr. DeWeese's fourth claim alleges that he was "terminated in violation of Ohio public policies favoring student and workplace safety . . . ." (ECF No. 1-2, ¶ 101.) That is, Mr. DeWeese claims that he raised concerns about student and workplace safety in his November 2013 letter. (*Id.* ¶ 102.)

Under Ohio law, proving tortious wrongful discharge in violation of public policy requires proof of the following elements: 1) "[t]hat a clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law"; 2) "[t]hat dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy"; 3) "plaintiff's dismissal was motivated by conduct related to the public policy"; and 4) "[t]he employer lacked overriding legitimate business justification for the dismissal . . . ." *Kulch v. Structural Fibers, Inc.*, 677 N.E.2d 308, 321 (Ohio 1997).

Mr. DeWeese has not put forth evidence to prove the first element, the existence of a "clear public policy." He points to general public policy surrounding "safety in the workplace," but this is insufficient. As *Kulch* explained, the plaintiff has the burden of identifying a specific policy "manifested in a state or federal constitution, statute or administrative regulation, or in the common law." *Id.* The public policy on which *Kulch* relied related to retaliation against workers for filing complaints with the Occupational Safety and Health Administration. *Id.* at 321–22. This is a specific, identifiable policy. General workplace safety is not.

Nor does Mr. DeWeese's November 2013 letter identify a specific public policy. The letter makes sporadic references to equipment in need of repair and facilities in need of an upgrade, but this letter cannot fairly be read to raise issues pertaining to a specific public policy or even to issues of "student and workplace safety" at all. This letter was about the risk of the SLETP's decertification. Mr. DeWeese's *ex post facto* attempts to reframe the letter as relating to public policy are contrived.

Hocking's Motion for Summary Judgment is **GRANTED** as to Count Four.

### E. Violation of Public Records Law

Mr. DeWeese's fifth and final claim alleges a violation of Ohio's public records law. In July 2014, Mr. DeWeese sent a public records request to Hocking. (Aff. of David Ball, ECF No. 23 ¶ 1.) Hocking produced some documents in response to this request but later produced additional, arguably responsive documents as a part of this case's discovery in 2016. (*Id.* ¶¶ 1–3.) In the interim, Mr. DeWeese initiated this suit, first filing his complaint on March 7, 2016. (2:16-CV-313, ECF No. 1-1.) Mr. DeWeese has sought a writ of mandamus for production of the records, as well as statutory damages, costs, and fees, pursuant to Section 149.43(C) of the Ohio Revised Code. (ECF No. 1-2, at 19.)

Hocking does not dispute these facts, instead arguing that Mr. DeWeese has now received all documents that he requested. (ECF No. 15, at 19–20.) However, this is not a complete defense to Mr. DeWeese's claim. Mr. DeWeese does acknowledge that he has now received all of the records that he requested. (ECF No. 24 at 19–20.) This moots the request for mandamus. *See State ex rel. Kesterson v. Kent State Univ.*, 123 N.E.3d 887, 892 (Ohio 2018).

However, Mr. DeWeese has shown that Hocking is not entitled to summary judgment on the entirety of this claim. There remains a genuine issue of material fact whether Hocking provided all responsive documents in response to the initial request or whether documents were delayed, thereby entitling Mr. DeWeese to damages and fees.

Defendant's Motion for Summary Judgment as to Count Five is **GRANTED** as to Plaintiff's claims for mandamus but is otherwise **DENIED**.

### IV. CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment is **GRANTED** as to Counts One through Four. Defendant's Motion for Summary Judgment as to

Count Five is **GRANTED IN PART** and **DENIED IN PART**.

    **IT IS SO ORDERED**.

                                      /s/ Sarah D. Morrison
                                      **SARAH D. MORRISON**
                                      **UNITED STATES DISTRICT JUDGE**